FANNIE METZGER v. THE MANCHESTER FIRE ASSURANCE
COMPANY.

*Fire insurance—Conditions of policy—Legal representative—False swearing by agent—Evidence—Opinion as to value of goods.*

1. The term "legal representative," as used in the clause in the Michigan standard fire insurance policy, "wherever in this policy the word 'insured' occurs, it shall be held to include the legal representative of the insured," refers to those who succeed to the insured's legal rights, by reason of his death or the transfer of the policy.
2. An affidavit, made at the request of fire insurance adjusters, as to the correctness of the books of the insured and the amount of stock at the time of the fire, is not one upon which a prosecution for perjury can be based.
3. An agent of the insured, who had the entire management and control of the business, and who held a power of attorney from the insured authorizing him to settle for the loss, executed and delivered to the adjusters a false affidavit regarding the books of account which had been kept by him. And it is held that the insured, if not a party to the deceit, and acting in good faith, is not precluded from recovering upon the policy under a clause therein providing that the same shall be void in case of any fraud or false swearing by the insured touching any matter relating to the insurance, whether before or after loss.
4. A dry goods and clothing merchant testified, in a suit to recover for damage to insured property, that he had been in the store of the plaintiff a number of times, but could not say that he was there within a month before the fire, but had been within a year; that he thought he had noticed a stock which would amount to anywhere from $9,000 to $12,000; that in such estimate he did not confine himself to the year before the fire, and that all he knew was that he had a recollection of being in the store several times, when he saw a good-sized stock of goods there. And it is held that the witness did not show himself competent to testify as to the value of the insured property.

Error to Chippewa. (Steere, J.) Argued April 25, 1894. Decided October 16, 1894.

*Assumpsit.* Defendant brings error. Reversed. The facts are stated in the majority opinion.

*Mark Norris,* for appellant.

*Hurst & Sullivan* and *Lawson C. Holden* (*L. E. Bradt,* of counsel), for plaintiff.

HOOKER, J. The defendant insured a stock of goods belonging to the plaintiff. Her business was managed by her husband, and she appears to have had little to do with it. He bought the goods and kept the books, and, in short, managed the business as he chose. He procured the insurance upon the stock. His authority was not in writing. The goods were injured by fire on January 13, 1892. The husband, Lewis L. Metzger, notified defendant's local agent of the fire a few days after it occurred, and adjusters of the defendant and other companies visited the place about a week later. They did not see the plaintiff. While there, the plaintiff executed a power of attorney to her husband, authorizing him to settle the loss. This was done at the suggestion of one or more of the adjusters, by whom the paper was drawn, that they would not settle with an agent unless his authority was in writing. An examination was made of the books kept by Lewis L. Metzger of the business; and he executed and swore to an affidavit, prepared by the adjusters, in which he stated that the books were correct, true, and accurate records of the transactions of the business, which was carried on under the name of the Giant Clothing Company, and showed the exact and actual transactions with the firms and individuals named therein, and that an inventory of February 1, 1891, shown to Vernor and Fletcher (two of the adjusters), was a true inventory of the goods on hand at that date, and that subsequent purchases and sales were truthfully entered in the books, and

added to said inventory. On March 9, 1892, the adjusters Vernor and Fletcher (the former representing defendant) sent notice to the plaintiff denying all liability under the policies upon the part of their respective companies, for two reasons: (1) Because of fraud; (2) because of attempted fraud.

In the investigation made by the adjusters, they discovered some entries on the books for which there were no bills, and this led to the discovery of alterations in the books, of which the following are specimens:

| Bill. | Actual Amount. | Amount on Books. | Fraudulent Raise. |
|---|---|---|---|
| T. Shirt & Collar Co. | $4 50 | $154 50 | $150 |
| Hart Bros. | 9 00 | 109 00 | 100 |
| K., N. & Fisher | 81 00 | 581 00 | 500 |
| Gallison, H. & Co. | 1 50 | 101 50 | 100 |
| J. Florsheim & Co. | 76 | 150 76 | 150 |
| L. B. Montague & Co. | Nothing | 430 00 | 430 |

In the journal was an entry of $1,931.69, ostensibly representing the amount of merchandise purchased in April, 1891. It was originally posted in the ledger as $931.69,— at that time being so entered in the journal,—which was the correct amount. The journal was changed so that it read $1,931.69, and the item was again posted in the ledger as $1,931.69, and the footings changed to correspond. The books also showed false entries of payment of these fictitious accounts. Lewis Metzger admitted that he made all of these false entries, and makes the excuse that he had marked the goods at 10 per cent. above actual cost, and that he made these entries five months before the fire, to make the books compare with the amount of stock, if it should be inventoried according to the raised cost mark. He said that he was trying to sell out, and he did this so that a purchaser would think he had paid the amount marked. He claimed that he did not know of

these false entries at the time that he made the affidavit, having forgotten them; and the jury so found, in answer to special questions. On redirect examination he attempted to patch the matter up by saying that the 10 per cent. was for freight and drayage; that he made the affidavit before these alterations were called to his attention, and he believed it to be true when he made it. A computation will show that the six items mentioned, which he says were all of the raised accounts, were raised from $96.76 to $1,526.76,—a raise of more than 1,400 per cent., instead of 10. His affidavit was admittedly false, and it requires great credulity to believe that he did not know it when he made it.

Counsel for defendant asked the court to hold that this was conclusive evidence of attempted fraud, and to direct a verdict, upon the theory that the act of the agent is the act of the principal.

The policy was the Michigan standard, which provides:

"This entire policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance or the subject thereof; or if the interest of the insured in the property be not truly stated herein, or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after loss.    *    *    *    *    *

"Wherever in this policy the word 'insured' occurs, it shall be held to include the legal representative of the insured."

It is contended that the fraudulent intent upon the part of the husband binds the wife, and forfeits the policy, under the last clause; counsel asserting that the term "legal representative" should be construed to include any one who is authorized to act for the insured, while plaintiff's counsel contend that it refers to those who succeed to her legal rights, by reason of her death or the transfer

of the policy. We think it should receive the latter construction. This defense is not that the company was defrauded in the making of the contract. In such a case the fraud of the agent could be asserted as a defense against the principal, whether the policy so provided in express terms or not. But the contract was valid, and, for the purpose of determining this question, we must assume that plaintiff has suffered an honest loss, for which she had a legitimate claim. An effort is made to defeat this by showing an attempt by an agent to deceive the defendant into paying a sum greater than the loss. Forfeitures and penalties are not favored in the law, and the language should not be unnecessarily extended by construction. The provision for a forfeiture of rights under the policy is doubtless a wise one, to prevent deceit on the part of insured persons; but it does not seem to us necessary, where the insured acts in good faith, and is not a party to the deceit. The word "insured" is used many times in the policy. If the broad construction contended for is to be given, it would follow that the company would have the right to require statements to be made and sworn to, not only by the insured, but by his legal representative, stating the belief of such representative, his interest, etc. It would not only compel the insured to make double proofs, if technically construed, but would place him at the mercy of his agent. But the attempt, if made with the knowledge and complicity of the insured, would be as effective to defeat the policy as though it had been made by him alone. It follows that the good faith of the plaintiff was a proper subject for investigation.

Counsel for the plaintiff assailed the conduct of the adjusters in requiring a power of attorney, and, under the guise of an objection to its introduction, intimated that it was done "for the purpose of ruining her." The evi-

dence shows that the power of attorney was required by Fletcher before defendant's adjuster arrived, and it was no more than an ordinary and proper precaution to require written authority from the policy-holder before settling with an agent. An examination of the paper shows it to be an ordinary power of attorney. It confers no more power upon Lewis Metzger than the testimony shows that he had without it, nor any more than the safety of the defendant required that he should have. There was no evidence that the adjusters did more than to say they should require written authority from Mrs. Metzger to her husband before they would settle with him, after which they, or some one else, prepared it, and Metzger took it to his wife, who executed it. She testified that she did not see the adjusters. When it was offered in evidence, counsel said:

" We object to the admission of this purported power of attorney in evidence, on the ground that it is incompetent and immaterial."

There was no occasion to call it a "purported power of attorney," nor could there be any reason for saying that a power of attorney was incompetent or immaterial. Moreover, the subject was introduced by plaintiff's counsel upon direct examination, having proved by the witness Metzger that he had a power of attorney, signed by his wife, at which point the defendant's counsel asked that the power be introduced, and the objection was made. The language was uncalled for and prejudicial. Litigants have a right to have their cases tried upon the merits, and appeals to the prejudices of jurors, by unfounded charges of fraud and deceit, are unwarranted. Whatever may be said concerning the affidavit, there was no testimony tending to show that the power of attorney was intended to trap the plaintiff, or deprive her of any rights. .

Nor are we prepared to concur with counsel in their attack upon the adjusters. They had every right to be-

lieve that Metzger was attempting a gross fraud upon the insurance companies, and it was their legal right to probe it to the bottom, and ascertain what there was of it, and the intent with which the representations were made. There was no occasion to talk of subornation of perjury, for the affidavit was one upon which a prosecution for perjury could not be based. If knowingly made, it was a simple lie, like any other, only more emphatic, because in writing, and verified by an oath, which should have had some moral restraint upon the affiant. Whatever may have been said about the impropriety of inducing persons to commit crime, we are not prepared to place on the same footing efforts to detect rascality and prevent fraud. Self-protection in business dealings would be a delusion if parties were to use the ordinary methods, at the hazard of legal censure, when dealing with persons who scruple at nothing. Crimes and frauds are not usually detected by informing the wrong-doer in advance that he is suspected. We think these adjusters had a right to suppose that this man would not swear to a statement if it was false, though he had taken the first step in deceit, and they certainly had the right to ascertain the value of the burned goods by any fair means.

The testimony of the witness Desenberg should not have been admitted. He testified that he had been in the store a number of times, but could not say that he was there within a month before the fire, but had been within a year, and he thought he had noticed a stock which would amount to anywhere from $9,000 to $12,000. He said that in this estimate he was not confining himself to the year alluded to, and that all he knew was that he had a recollection of being in the store several times, when he saw a good-sized stock of goods there. He did not show himself competent to testify upon the subject.

Other questions raised we think it unnecessary to discuss.

The judgment will be reversed, and a new trial ordered.

McGRATH, C. J., LONG and MONTGOMERY, JJ., concurred with HOOKER, J.

GRANT, J. I concur with my Brother HOOKER in the reversal of this case. I also concur with his statement that—

" Forfeitures and penalties are not favored in the law, and the language should not be unnecessarily extended by construction. The provision for a forfeiture of rights under the policy is doubtless a wise one, to prevent deceit on the part of insured persons; but it does not seem to us necessary, where the insured acts in good faith, and is not a party to the deceit."

Did the facts in this case make the plaintiff a party to the deceit? This, of course, depends upon the determination of the question, whether the acts of her agent were in fact her acts. It will be conceded that if she made false and fraudulent representations the policy was rendered void. I cannot assent to the rule that, where one trusts the entire management of his business to an agent, the principal is not responsible for the fraudulent acts and representations of the agent in connection with the business. It is manifest from this record that the plaintiff knew nothing about the business. It was carried on in her name. Grant that it was carried on for her benefit, still she constituted her husband her sole agent to buy and sell, attend to the insurance, and exercise exclusive control and management of the entire business. When the adjusters came to adjust the loss, he appeared as her sole representative. The defendant desired that he should obtain from the plaintiff a written authority to act for her. She voluntarily executed a power of attorney giving him full authority in the premises. She should be held responsible

for his acts and conduct. Seldom do the records of insurance litigation exhibit a more deliberate and glaring attempt to defraud an insurance company. Such attempts should not be made successful, under the guise of agency, especially where there exists the intimate relation of husband and wife; the one claiming to be an innocent principal, and the other a confessedly dishonest agent.

The judgment should be reversed, and no new trial ordered.